# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ASTRO TECHNOLOGY, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0745 |
| | § | |
| ALLIANT TECHSYSTEMS, INC., | § | |
| *et al.*, | § | |
|     Defendants. | § | |

## MEMORANDUM AND ORDER

This commercial dispute is before the Court on the Motion for Clarification or Reconsideration ("Motion for Reconsideration") [Doc. # 161] filed by Plaintiff Astro Technology, Inc. ("ATI"), the Motion to Exclude Expert Testimony of Scott Beckwith ("Beckwith Motion") [Doc. # 116] filed by Defendants Alliant Techsystems, Inc. ("ATK"), ATK Aerospace Company, Inc. (f/k/a Thiokol Propulsion Corporation) (collectively "Thiokol"), Scott Hyde, and Kurt Mildenhall, and Defendants' Motion for Summary Judgment on All Remaining Claims [Doc. # 112]. These motions have been fully briefed, and the Court conducted a hearing on the Beckwith Motion. Having considered the parties' submissions, the evidence presented at the hearing, and applicable legal authorities, the Court concludes that Plaintiff's Motion for Reconsideration should be **denied**, the Beckwith Motion should be **granted**, and Defendants' Motion for Summary Judgment should be **granted**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The factual allegations in this case are set forth fully in the Court's Memorandum and Order entered March 24, 2004 ("March 2004 Opinion") [Doc. # 37] and will not be repeated here. Briefly, ATI's president, David Brower, alleges that he has one or more trade secrets[1] in an inchoate plan containing possible options to ascertain feasible ways to use fiber optics to obtain data from inside operational rocket motors. Defendant ATK is an aerospace and defense company with business divisions in aerospace propulsion, composite structures, and munitions for the military.

In December 1999, Brower gave a general presentation at a Joint Army Navy NASA Air Force Conference ("1999 JANNAF Conference") in which he described generally his concept of using fiber optic sensors in solid rocket motors. Defendant Hyde, then working for Thiokol, attended the conference and heard Brower's presentation. Hyde invited Brower and ATI to discuss the possibility of a business relationship between ATI and Thiokol.

---

[1] Plaintiff and its president, Brower, refer to their plan as a single trade secret and also to the various elements of their plan as "trade secrets." Conceptually, however, it is more appropriate to refer to ATI and Brower plan as a unified trade secret. For that reason, the Court in this Memorandum and Order will refer to a single trade secret rather than a series of changing trade secrets.

In January 2000, Brower visited Thiokol's headquarters to make a presentation to several Thiokol employees and managers, including Hyde and Defendant Kurt Mildenhall. Brower alleges that he was asked to prepare a test plan that would demonstrate ATI's methods for using fiber optics to obtain data from the solid rocket motors that Thiokol builds for the NASA space shuttle.

On March 9, 2000, several Thiokol representatives visited ATI's headquarters to discuss Brower's fiber optics ideas. At that meeting, ATI and Thiokol executed a Proprietary Information Agreement ("PIA"). ATI then presented a volume entitled "Application of Fiber Optic Sensors to Solid Rocket Motors." Brower alleges that this volume is part of his trade secret.

At a JANNAF Conference in November 2000, a Thiokol employee presented a paper summarizing the results of a pressure vessel test. Plaintiff alleges that this presentation violated the Lanham Act because Thiokol did not disclose that ATI conducted the pressure vessel test discussed in the presentation.

In June 2002, Thiokol employees Mildenhall and Mont Johnson made a presentation at a Navy Conference in Washington, D.C. on fiber optic sensor technology. Plaintiff alleges that this presentation is a misuse of ATI's trade secret and a violation of the Lanham Act.

Plaintiff filed this lawsuit in 2003 asserting the following causes of action: (1) breach of the PIA; (2) fraud in the inducement of an oral contract; (3) breach of the oral contract; (4) promissory estoppel; (5) fraud in inducing ATI to disclose its trade secret; (6) negligent misrepresentation; (7) misuse/misappropriation of trade secrets; (8) misappropriation of ideas; (9) conversion; (10) reverse palming off and statutory unfair competition under 15 U.S.C. § 1125(a)(1); (11) common law unfair competition; and (12) unjust enrichment. The Court previously dismissed Plaintiff's promissory estoppel claim and granted summary judgment in favor of Defendants on Plaintiff's claims for fraud in the inducement of an alleged oral contract and breach of that oral contract. After discovery, Defendants moved for summary judgment on Plaintiff's remaining claims and to exclude Plaintiff's expert testimony.[2] In connection with Defendants' Motion to Exclude Brower's expert opinions, the Court ordered Brower to prepare an expert report and noted that Brower had been properly designated as an expert only on damages. Plaintiff filed its Motion for Reconsideration, challenging both the requirement for Brower to submit an expert

---

[2] In addition to their Motion to Exclude Expert Testimony of Scott Beckwith, Defendants moved to exclude testimony from Plaintiff's experts on damages – David Brower, Randall L. Peeters and David M. Katzen. In light of the Court's ruling on Defendants' Motion for Summary Judgment, the motions to exclude damages experts are moot.

report and the limitation on the scope of Brower's testimony. These pending motions are now ripe for decision.

## II. MOTION FOR RECONSIDERATION

In an Order entered July 29, 2005 ("July 29 Order") [Doc. # 158], the Court ordered Brower to provide an expert report which satisfies the requirements of Rule 26(a)(2)(B). The Court also noted that Plaintiff's letter designating Brower as an expert mentioned only the issue of damages and, therefore, Brower would be permitted to testify as an expert, if at all, only on that issue. Plaintiff filed its Motion for Reconsideration, arguing that Brower should be permitted to testify as an expert on all issues. Plaintiff also argues that Brower should not be required to prepare a written report and, if he is required to prepare a report, Defendants' employee-expert witnesses should also be required to do so.[3]

Plaintiff's Motion for Reconsideration was filed August 16, 2005, more than ten days after the Court's July 29 Order. Accordingly, it is properly considered under Rule 60(b) of the Federal Rules of Civil Procedure. *See Dial One of the Mid-South, Inc. v. BellSouth Telecommunications, Inc.*, 401 F.3d 603, 606 (5th Cir. 2005). Relief under Rule 60(b) requires a showing of either a clerical mistake (FED. R. CIV. P. 60(a)), or one of the following: "(1) mistake, inadvertence, surprise, or excusable

[3] Brower has now prepared and submitted his expert report. Therefore, to the extent the motion urges the Court not to require Brower to prepare a report, the motion is moot.

neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . ., misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, . . .; or (6) any other reason justifying relief from the operation of the judgment." FED. R. CIV. P. 60(b). A Rule 60(b) motion "cannot be used to raise arguments which could, and should, have been made before" the challenged ruling. *Dial One*, 401 F.3d at 607.[4]

Plaintiff does not indicate in its motion the specific basis for the requested relief. Instead, Plaintiff merely expresses its disagreement with the Court's order. The Court's order that Brower would be permitted to testify as an expert, if at all, only on the issue of damages, is supported by the May 3, 2004 letter from Plaintiff's counsel to defense counsel designating Brower as an expert. The letter designated certain individuals, including Brower, as experts. Enclosed with the letter were the expert reports of the named witnesses, including a document containing the "opinions of Dave Brower relating to damages." That document did not include opinions on any other subject. The Court again finds that Brower was not properly designated as

---

[4] Were the Court to consider Plaintiff's motion under Rule 59(e), the outcome would be the same. Rule 59(e) motions either must establish a manifest error or present newly discovered evidence and, like Rule 60(b) motions, cannot be used to raise arguments which could, and should, have been made before the order was issued. *See Schiller v. Physicians Resource Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

an expert on any issue other than damages and may not provide expert testimony on liability issues. Plaintiff's Motion for Reconsideration does not meet any legal standard or provide a factual or legal basis for alteration of the Court's ruling.

Plaintiff correctly noted in both its opposition to Defendants' motion to exclude Brower's expert testimony and its Motion for Reconsideration that Rule 26(a)(2)(B) does not require written expert reports from individuals who are not retained or specially employed to provide expert testimony or whose duties as an employee of the party do not regularly involve giving expert testimony. Plaintiff concedes, however, that the Court has discretion to require an expert report from such individuals. The subject of Brower's proposed testimony, Plaintiff's damages, is not within Brower's ordinary work assignments. Therefore, Defendants are entitled to know Plaintiff's damages theories espoused through Brower.

Although the Court might well have required written reports from Defendants' employee-experts, Plaintiff did not make that request until it filed its Motion for Reconsideration. Plaintiff's request now is untimely.

Plaintiff has not established that it is entitled to Rule 60(b) relief and its Motion for Reconsideration is denied.[5]

---

[5] On September 1, 2005, Plaintiff filed a Motion for Leave to File Reply Brief [Doc. # 164]. Defendants' opposition to Plaintiff's Motion for Reconsideration was filed August 22, 2005. Pursuant to the Court's Procedures, Plaintiff was required to file any reply within three days.
(continued...)

## III. MOTION TO EXCLUDE EXPERT REPORT OF SCOTT BECKWITH

Scott W. Beckwith, Ph.D., submitted his initial report in May 2004, a second report in October 2004, and another report in February 2005. Defendants filed the Beckwith Motion, seeking to exclude Beckwith's opinions in the October 2004 and the February 2005 reports.[6] The Court conducted a hearing on the motion (the "*Daubert* hearing"), at which Beckwith testified both on direct and cross-examination. Beckwith was also questioned at length by the Court.

### A. Standards for Expert Testimony

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. The trial judge must determine as an initial matter whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

---

[5]    (...continued)
Although Plaintiff's Motion for Leave to File Reply Brief is untimely, in the interests of justice it will be granted. The Court has considered the arguments in Plaintiff's Reply Brief in this ruling.

[6]    Plaintiff does not offer any opinions from the May 2004 report.

156 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

Under *Daubert*, the district court is to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [reliability] and of whether that reasoning or methodology can be applied to the facts at issue [relevance]." *Skidmore v. Precision Printing And Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 592-93). This so-called "gate-keeping" obligation applies to all types of expert testimony, not just "scientific" testimony. *Id.* at 617-618 (citing *Kumho*, 526 U.S. at 147). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 151. The Court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equipment Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

Reliability and validity do not require certainty, but must be demonstrated by evidence that the knowledge is more than speculation. *Daubert*, 509 U.S. at 590. To demonstrate reliability, the proponent of the expert testimony must present "some objective, independent validation of the expert's methodology. The expert's

assurances that he has utilized generally accepted scientific methodology is insufficient." *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*), *cert. denied*, 526 U.S. 1064 (1999). The Court must consider (1) the validity of the scientific principles used; (2) the accuracy of the data relied upon by the expert; and (3) the correctness of the application of the scientific principles to the relevant data. *See, e.g., Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Marcel v. Placid Oil Co.*, 11 F.3d 563, 567 (5th Cir. 1994). Four factors to consider in determining the reliability of proffered scientific evidence are (1) whether the theory or procedure has been subjected to testing; (2) whether it has been subjected to peer review and publication; (3) the rate of error and the existence of standards controlling the theory or procedure; and (4) whether it has attained general acceptance. *Watkins*, 121 F.3d at 989 (citing *Daubert*, 509 U.S. at 593-94). This analysis, however, is a flexible one. "[N]ot every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy*, 394 F.3d at 325.

Rule 704 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704. The Fifth Circuit, however, "has repeatedly held that Rule 704 does not allow an expert

to render conclusions of law." *United States v. $9,041,598.68*, 163 F.3d 238, 255 (5th Cir. 1998) (citing *Snap-Drape, Inc. v. Comm'r of Internal Revenue,* 98 F.3d 194 (5th Cir.1996)).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore*, 151 F.3d at 276. The party offering the challenged expert opinions need not, however, prove "that the expert's testimony is correct." *Id.*

## B.    Procedural Challenges to Admissibility of the February 2005 Report

The deadline, as extended, for designation of experts and production of expert reports for this case was October 15, 2004. Beckwith submitted an October 2004 report in which he expressed certain opinions regarding the definition of ATI's trade secrets and Thiokol's misappropriation of those trade secrets. Nowhere in the October 2004 report does Beckwith either give opinions regarding damages or state that he has been asked to give such opinions but needs additional information. Beckwith was deposed in November 2004.

In February 2005, Beckwith submitted a new report which Plaintiff's counsel claims was a supplemental report necessitated by additional discovery produced by Defendants after the October 2004 report and after Beckwith's deposition. The

February 2005 report includes completely new opinions on damages and dramatically revised opinions regarding the alleged trade secrets and their alleged misuse.

With reference to the definition of the trade secrets, the necessary information for those opinions was within ATI's possession from the beginning of the case and, therefore, the documents were or should have been available for Beckwith's review prior to the October 2004 report submitted on the October 15, 2004 deadline. The February 2005 report is not a "supplemental" report defining trade secrets based on newly-produced documents[7]; it is instead an untimely expert report. Consequently, the opinions in the February 2005 report regarding the existence and definition of ATI's trade secrets are stricken as grossly untimely.

With reference to the opinions regarding misappropriation, however, it appears that Thiokol's document production after the October 2004 report contained various documents that Beckwith found to be material. Although it is clear that Thiokol made substantial document production before the October 2004 report and before the October 15, 2004 deadline, the Court cannot conclude that the later production of documents such as test plans and protocols did not warrant the supplementation on the misappropriation issue set forth in the February 2005 report. As a result, the

---

[7]     The Court notes that Beckwith in the February 2005 report identifies with more detail basically the same trade secret identified in the October 2004 report.

Court will not strike Beckwith's opinions on misappropriation from the February 2005 report.

With reference to Beckwith's opinions on damages, the February 2005 report is not only untimely, but also Beckwith was not properly and timely designated as an expert on damages. Although Beckwith testified at the *Daubert* hearing (in a generalized manner) that he had been asked prior to the October 2004 report to provide an opinion on damages, ATI did not designate him as an expert on damages. Nor did Beckwith state in the report, including the statement of his assignment, that he had been *asked* to provide a damages calculation. Instead, he described his assignment only as reviewing the ATI technology, reviewing the Thiokol technology, and comparing the ATI technology with that "known to exist within the Public Domain." October 2004 Report, p. 4. Moreover, during his deposition in November 2004, Beckwith testified repeatedly that he was not an expert on damages calculations, that he had no prior experience developing damages models, and that he was the technical expert and David Katzen was the damages expert. The opinions on damages contained in the February 2005 report are untimely opinions by a witness who was not properly or timely designated as an expert on damages. Accordingly, the damages opinions will be stricken from the February 2005 report.

### C.     **Beckwith's October 2004 Opinions on Trade Secrets**

In the October 2004 report, Beckwith describes in very general terms ATI's ideas regarding the use of fiber optic sensors inside solid rocket motors. *See* October 2004 Report, p. 4. He opines that ATI's ideas had not been disclosed publicly before the March 2000 meeting between ATI and Thiokol that was subject to the PIA and that, on and after March 9, 2000, ATI disclosed "a large number of pertinent trade secrets" to Thiokol. *Id.* at 7. He opines generally that ATI's "trade secrets contain numerous components that are critical to obtaining critical solid rocket motor design information, analysis verification, test data at critical motor operating conditions, information for improving reliability" and that they "provide potential data for the 'health monitoring' of aging solid rocket motor systems." *Id.* at 8. He then provides a "partial listing" of ATI's trade secrets that is copied from one of ATI's statements of the trade secrets produced in this litigation. *Id.* at 8-10.[8]

*Qualifications.*– Beckwith has a B.S. in Aerospace Engineering from Texas A&M University, an M.S. in Aeronautics from the California Institute of Technology, and a Ph.D. in Interdisciplinary Engineering (Materials and Mechanics) from Texas A&M University. Between 1965 and 1969, he was the primary Air Force Project Engineer on solid rocket technology programs. From 1974 until 1992, Beckwith was

---

[8]     Beckwith copied from ATI's answer to Thiokol's Interrogatory No. 3.

employed by Hercules Aerospace Corporation ("Hercules"), where he was responsible for an engineering group developing solid propellant/casebond test methods for use with solid rocket motors. He has served on technical advisory committees as the international expert for solid rocket propulsion technology. For the past seven years, he has been the International Technical Director for the Society for the Advancement of Material and Process Engineering ("SAMPE"), and the Technical Editor for its Journal. He has served as a consultant and litigation expert on issues relating to plastics, elastomeric and rubber materials, advanced composites and traditional fiber-reinforced plastic composite materials, manufacturing technologies and applications. The Court finds that Beckwith has significant education, training, and experience in solid rocket motor technology to offer opinions in that area.

Beckwith concedes, however, that he has no expertise and, indeed, no first-hand clinical knowledge in the area of fiber optics and fiber optic sensors. Beckwith throughout his career has relied on the expertise of others for fiber optics experimental work, input into his projects, and problem solving. Beckwith does not follow in any detail the scientific developments in the fiber optics field. He conveyed only a superficial knowledge about basic equipment and developments in the fiber optics area. While ATI attempts to characterize this as a "rocket motor" dispute, and

Thiokol attempts to characterize this as a pure "fiber optics" case, the Court finds that the substantive issues in the case require either a single, properly designated expert with combined expertise in both subject areas or a properly designated expert in one area working in tandem with a properly designated expert in the other area to form relevant opinions. Because he lacks fiber optics expertise, Beckwith's opinions defining ATI's trade secrets are based almost totally on his faith in Brower, an interested party, ATI's attorneys' opinions, and Beckwith's underlying, untested opinion that Brower is an expert in both fiber optics and rocket motor technology.[9]

Additionally, Beckwith bases his opinions regarding the existence and identification of ATI's trade secrets on his own (and Brower's) definition of a trade secret. Beckwith, however, is not qualified from a legal standpoint to determine what is a legally protectable trade secret and, as discussed more fully below, his testimony at the *Daubert* hearing shows that he used a definition materially less stringent than the accepted legal definition.

---

[9]     Plaintiff argues in this regard, and elsewhere, that the technology is so advanced or cutting edge that there is no person – other than possibly Brower – with the necessary expertise. The Court is unpersuaded. In any event, the issue here is whether Beckwith has the necessary knowledge. Plaintiff has failed to demonstrate that Beckwith meets the necessary threshold as to the fiber optics component of the issues presented.

Although Beckwith would likely be qualified to express an opinion on pure solid rocket motor technology issues, he lacks the necessary qualifications to offer expert opinions on the trade secret issues in this case.

***Reliability and Relevance.*** – Initially, it appears that Beckwith developed his opinions based on an inaccurate understanding of what constitutes a legally protectable trade secret. During the *Daubert* hearing, he testified essentially that a trade secret is something that you possess that you consider to be of value and that you do not want your competition to have unless they pay you for it. Missing from Beckwith's definition is the requirement that the alleged trade secret must be used in the owner's business to give the owner the ability to obtain an advantage over the competitors who do not know the secret.[10] *See, e.g., Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir. 1994). Additionally, Beckwith's definition would improperly include "marketing concepts and new product ideas," "business possibilities or goals," and "undeveloped ideas and plans" that are not protected as trade secrets. *See, e.g., Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499-500 (S.D.N.Y. 2002); *see also Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App. – Corpus Christi 1990, no pet.). Because he evaluated the evidence and the results of his limited search of the

---

[10]     As discussed more fully in connection with Defendants' Motion for Summary Judgment, there is no evidence that ATI has used or could use the alleged trade secret in its own business.

published literature based on a misconception of what constitutes a trade secret under Texas law, his entire methodology is neither reliable nor relevant.

In addition to the incorrect focus of his methodology, Beckwith's methodology itself was inadequate. His review of published literature was extremely limited in its scope. He concedes that his opinions are based in large part on his own prior experience working in the rocket motor industry, work that ended in 1992. He claims to have reviewed all discovery materials in the case, but in his reports he did not relate his opinions to any particular documents in order for those documents to be reviewed by the Court (or Defendants) when evaluating the reliability and relevance of his opinions. During the *Daubert* hearing, he exhibited only limited knowledge and understanding of many of the relevant documents. He took no notes while he reviewed the tens of thousands of pages of discovery and other documents, and he made no effort to compare testimony or evidence from different witnesses. Beckwith merely identifies general problems associated with obtaining data from inside solid rocket motors, but fails to provide a detailed explanation of how Brower's alleged trade secrets addressed and resolved – as opposed to identified and made proposals to try to address – those particular problems. He claims to have written his reports as he read the discovery materials, but there is no indication that he incorporated new information or considered inconsistent information in the development of his

opinions. He did not analyze the reasons for the divergence of other opinions from those of Brower or his own. Indeed, at best, he appears to have reviewed the discovery and published materials superficially. As a result, his reports appear to be merely stream of consciousness with no references or explanation about what documents or information are relied on in reaching his opinions, nor technical explanations of what Brower substantively developed that was truly new and proprietary.

Beckwith's opinions on the existence of trade secrets appear to be mere *ipse dixit* to the extent they are anything other than parroting of Brower's personal views. Rather than conduct and report the results of critical, independent analysis, it appears that Beckwith relied heavily, if not exclusively, on the representations of Brower and ATI's counsel. His expert report is at best an effort to synthesize Plaintiff's allegations and present them summarily as an expert opinion. Consequently, Beckwith's opinions about the existence of trade secrets are neither reliable nor relevant.

***Conclusion.*** – Although Beckwith has significant and impressive education, training, and experience in solid rocket motor technology, he lacks the fiber optics knowledge necessary to qualify as an expert on trade secrets in this case. He is also not qualified to assess what constitutes a legally protected trade secret. Although the

Court does not question Beckwith's sincerity, his opinions are both unreliable and irrelevant, in part because he lacks the proper qualifications and in part because he failed to use an acceptable methodology. As a result, Defendants' Beckwith Motion will be granted as to the opinions regarding the existence and identity of the trade secrets.[11]

### D. Beckwith's February 2005 Opinions on Misappropriation

In the February 2005 report, Beckwith opines that Thiokol misappropriated ATI's trade secrets by using them as the basis for its own in-house fiber optics research. Beckwith summarily and without reference to any specific supporting evidence characterizes all fiber optics testing conducted by Thiokol after March 2000 as a misappropriation of ATI's trade secret. For example, Beckwith states that it was a misuse of the trade secret for Thiokol *inter alia* to initiate and complete fiber optic tests in motors; to conduct adhesive bonding tests using derivatives of ATI's recommended adhesives; to conduct ruggedization tests on derivative designs for protecting fiber optic cabling; to conduct thermal cycling tests with fiber optics; to conduct gravitational loads with fiber optic sensors; and to conduct bore pressure testing with fiber optics. *See* February 2005 Report, pp. 16-17. In Beckwith's

---

[11] Even if the February 2005 Report were timely on the question of the identity of ATI's trade secrets, the Court's conclusions on the admissibility of Beckwith's conclusions (and his qualifications to opine on the issue) would be the same.

opinion, it is a misappropriation of ATI's trade secret for Thiokol to conduct such tests even if the adhesives, the designs, and the methods are not those suggested by ATI, but are "derivatives" of ATI's suggestions.

*__Qualifications.__*– Beckwith's relevant qualifications are discussed fully in connection with his opinions on trade secrets. His lack of the necessary fiber optics expertise is particularly troubling in connection with his opinions on misuse or misappropriation. Because his expertise is in solid rocket motor technology, he defines and assesses the issues only from that perspective, which lacks an ability to recognize and appreciate the complexities and importance of the fiber optics issues presented in the independent research by Thiokol and others besides ATI. Without pointing to or contrasting any independent scientific or industry support on fiber optics or solid rocket motor technology, Beckwith assumes that all Thiokol's research is necessarily a misuse of ATI's alleged trade secrets.

As is discussed above, Beckwith lacks the necessary fiber optics knowledge and experience to qualify as an expert in this case on trade secrets and their alleged misappropriation.

*__Reliability and Relevance.__*– For the same reasons discussed in connection with his opinions regarding the existence and scope of ATI's trade secrets, Beckwith's opinions regarding Thiokol's alleged misuse of those trade secrets are based on an

inadequate methodology and are neither reliable nor relevant. Despite his claim to have read all the discovery and pleadings in this case, he fails to take into account in any meaningful way the extensive factual record. Indeed, other than the fact that Thiokol performed tests after ATI's presentations to Thiokol, Beckwith cites to nothing to establish the foundation for his misappropriation opinions. Inexplicably, Beckwith apparently failed to address in his report, or to appreciate at the hearing, the significance of many ATI and Thiokol documents evidencing *both* public disclosures by Brower of the fundamental aspects of his trade secrets prior to March 2000 (when Brower made his presentation to Thiokol) and others' research involving fiber optic sensors in solid rocket motors contemplated and/or conducted independently from any alleged ATI trade secrets. Other than in the most general terms, Beckwith does not link his opinions regarding the misappropriation alleged by ATI with any documents or other evidence in the record. Nor does he cite to or rely on any articulated scientific principles or writings on solid rocket motor research or fiber optics developments published before or after March 2000 to demonstrate that ATI's alleged trade secrets were being misused. Beckwith's simplistic analysis that all fiber optics research Thiokol has done after March 2000 constitutes misappropriation of ATI's alleged trade secrets fails to appreciate or address the proposition that the alleged trade secret is largely a research plan to try to solve basic and often obvious

issues of devising workable instrumentation inside any motor, attaching the sensors inside the motor, placing the sensors in pertinent locations, and selecting sensors that can withstand the intense heat and pressures inside the motor at different stages of the motor's operation. As was true with his methodology regarding the trade secrets, Beckwith's opinions regarding misuse are based primarily on Plaintiff's counsel's and Brower's assessments without independent, critical analysis. Fundamentally, Beckwith has not shown and the Court is unpersuaded that Beckwith applied in his efforts as an expert in this case the same rigor he would have applied to his work in the solid rocket motor industry.

***Conclusion.*** – Beckwith lacks the necessary qualifications to provide expert opinions in this case on the issue of misappropriation of fiber optic technology in solid rocket motors. Moreover, his opinions on the misappropriation issue are both unreliable and irrelevant. As a result, Defendants' Beckwith Motion will be granted as to the misappropriation opinions.

### E. Beckwith's Opinions on Damages[12]

As is noted in connection with the procedural challenges to Beckwith's opinions on damages, the October 2004 report contained no damages opinions.

---

[12]     In an exercise of caution, the Court will conduct the *Daubert* analysis of Beckwith's damages opinions despite the Court's previous ruling that he was not properly or timely designated as an expert on damages.

Indeed, there is no indication in the October 2004 report that Beckwith had been asked at that time to develop an opinion on damages. In the February 2005 report, Beckwith presented the opinion that the measure of ATI's damages should be calculated based on Thiokol's current and projected expenditures for research into fiber optic sensors. While he estimated this figure to be $22.5 million through the year 2010 (of which $12.5 million had already been spent), Beckwith offered his "[b]est guess" that ATI's damages would be "somewhere in the $15-20MM range." He did not explain the difference between his projected expenditure figure and his damage figure.

In apparent recognition that his "best guess" in the February 2005 report was based on Beckwith's over-inclusive calculation of Thiokol's current and projected expenditures and could not withstand a *Daubert* challenge, Beckwith presented different and conflicting testimony during the *Daubert* hearing. At the hearing, Beckwith again opined that ATI's damages were $15-20 million, but based that damages figure on an "appropriate compulsory license fee" that should have been paid to ATI sometime in 2000. Beckwith then testified that a "one time perpetual license fee" of $15-20 million was appropriate based on a ten-to-one ratio between the expected future value of the trade secret and the fee. When pressed, he was unable to articulate clearly how he calculated the "expected value of the trade secret,"

or why it is conceivable, much less reasonable to believe, that Thiokol would have paid $15 million in 2000 for an undeveloped, untested general concept.[13] Indeed, in a moment of candor Beckwith stated that Brower should have *asked* for $15 million in 2000, but he does not know whether (and doubted) Thiokol would have been willing to pay such an amount.

***Qualifications.***– Beckwith testified in his deposition that he has no prior experience with damages models and that damages are outside his area of expertise. He testified during the *Daubert* hearing that he has never negotiated license fees, but has provided information to others for license fee negotiations. His experience with license fees is limited to his experience while employed by Hercules, employment that ended in 1992. Beckwith, while clearly a qualified expert in certain areas of solid rocket motor technology, does not have adequate knowledge, experience, training or education to offer an opinion on the issue of damages.

***Reliability and Relevance.***– Beckwith's opinions on damages are unreliable because they are not based on accepted methodology. Indeed, at the *Daubert* hearing, Beckwith was unable to provide a coherent explanation of the methodology underlying his "best guess" that an appropriate license in this case would be between

---

[13]    Beckwith acknowledged that in 2000, there were numerous unsolved mechanical, logistical, and other problems with using fiber optics to gather data from the inside of a solid rocket motor, and that some of those problems still have not been solved today, 5½ years later.

$15-20 million. He was unable to identify any prior situation in which a parties' damages for loss of a trade secret were calculated based on how much the alleged wrongdoer is projected to spend in developing what is claimed to be another's trade secret. He testified that ATI should have requested a license fee in 2000 based on a "tenth-to-one" ratio, but when asked "tenth of what?" by the Court, he could not provide any comprehensible answer. Eventually, Beckwith conceded that it is his basic opinion that ATI should have requested in 2000 a license fee in the $15-20 million range, but that he has no basis for believing that Thiokol would have paid that amount.

Beckwith's opinion on damages, both as stated in the February 2005 report and during the *Daubert* hearing, is unreliable because it is not supported by any acceptable methodology. The opinions are excludable because they are "connected to existing data only by the *ipse dixit* of the expert." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Guile v. United States*, __ F.3d __, 2005 WL 1971267 * 4 (5th Cir. Aug. 17, 2005). A court should "exclude expert testimony where . . . an expert has extrapolated data, and there is 'too great an analytical gap between the data and the opinion proffered.'" *Burleson v. Texas Dept. of Crim. Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (quoting *Joiner*, 522 U.S. at 146).

Beckwith's damages opinion is also irrelevant in this case. Beckwith based his damages opinion in the February 2005 report on his projection that Thiokol would spend approximately $22.5 million on fiber optic sensor research, and based his damages opinion during the *Daubert* hearing on his personal belief that $15-20 million would be an appropriate license fee for the ATI trade secrets. Beckwith did not, however, identify an adequate factual basis for either the projected expenditures or the license fee estimate.[14] Absent reliable evidence to support the damages opinions, the opinions are not relevant under Rule 701. *See Burleson*, 393 F.3d at 587.

**Conclusion.** – Beckwith is not qualified to provide expert opinions on damages in this case, and his opinions are both unreliable and irrelevant. As a result, Defendants' Beckwith Motion will be granted as to the damages opinions.

## IV.   MOTION FOR SUMMARY JUDGMENT

Defendants seek summary judgment on Plaintiff's remaining claims. Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

---

[14]   For instance, the uncontradicted evidence establishes that Beckwith included in the expenses billings for time that Thiokol employees spent on unrelated projects. Inclusion of this time lacks any reasonable basis.

case, and on which that party will bear the burden of proof at trial." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir.), *cert. denied*, 537 U.S. 824 (2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex*, 477 U.S. at 322-23; *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.,* 336 F.3d 410, 412 (5th Cir. 2003). However, factual controversies are resolved in favor of the nonmovant only when there is an actual controversy – "that is, when both parties have submitted evidence of contradictory facts." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Freeman v. Texas Dept. of Crim.*

*Justice*, 369 F.3d 854, 860 (5th Cir. 2004). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).

If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting *Brenoettsy*, 158 F.3d at 911); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998); *Zucker ex rel. AIM Small Cap Growth Fund v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 847 (S.D. Tex. 2005). "Conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden at summary judgment." *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1429 (5th Cir. 1996); *see Roberson v. Alltel Information Services*, 373 F.3d 647, 654 (5th Cir. 2004); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d

466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950 (2002). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris*, 144 F.3d at 380.

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* Fed. R. Civ. P. 56(e); *Love v. Nat'l Medical Enterprises*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003). Of particular importance in this case, "it is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *accord Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 385-87 (5th Cir. 2000), *cert. denied*, 531 U.S. 1073 (2001); *Valleza v. City of Laredo*, 331 F. Supp. 2d 579, 583 (S.D. Tex. 2004). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

Additionally, it is not the function of the court to search the record on the nonmovant's behalf for evidence which may raise a fact issue. *See Complaint of Port Arthur Towing Co.*, 42 F.3d 312, 318 (5th Cir.), *cert. denied*, 516 U.S. 823 (1995); *Topalian v. Ehrman*, 954 F.2d 1125, 1137 n.30 (5th Cir.), *cert. denied*, 506 U.S. 825

(1992). In the absence of proof, the Court will not assume that the nonmovant could or would prove the necessary facts. *See Burns v. Harris County Bail Bond Bd.*, 139 F.3d 513, 518 (5th Cir. 1998).

## A.    <u>Breach of the PIA</u>

The elements of a breach of contract case under Utah law[15] are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages. *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). When interpreting a written contract, the Court should "consider each provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Fairbourn Commercial, Inc. v. American Houston Partners, Inc.*, 94 P.3d 292, 295 (Utah 2004) (internal quotations omitted).

The PIA notes initially that it is being entered into because the parties "may wish to disclose to each other certain information, some of which may be Proprietary Information as defined below,[16] for the purpose(s) of developing fiber optic sensors

---

[15]    The PIA provides that its "validity, interpretation, and effect" is governed by the laws of the State of Utah. PIA, Exh. 62 to Defendants' Motion for Summary Judgment, ¶ 17.

[16]    The PIA defines "Proprietary Information" as follows:

> Thiokol has acquired, developed, will continue to develop, and owns certain valuable information which it deems proprietary and relating to the Program. Astro Technology has acquired, developed, will continue to develop, and owns certain valuable information relating to fiber optic sensors. All of such Thiokol and Astro Technology information is referred to hereinafter as
> (continued...)

for use in solid rocket motors in connection with RSRM and Thiokol IR&D." PIA, Exh. 62 to Defendants' Motion for Summary Judgment, ¶ 1. To accomplish this purpose, the PIA sets forth the conditions governing "the use, duplication or disclosure of any Proprietary Information that may be disclosed by one party to another." *Id.*, ¶ 2. One of the specific conditions is that the parties may use Proprietary Information "only for the purpose(s) stated above [developing fiber optic sensors for use in solid rocket motors in connection with RSRM and Thiokol IR&D] and for no other purpose unless the originating party shall agree herein or hereinafter in writing." *Id.*, ¶ 4.

Another specific condition governing the use, duplication or disclosure of Proprietary Information is that its disclosure must "be in written or other permanent form, and *be prominently identified as proprietary using an appropriate legend, marking stamp or other clear and conspicuous written identification which unambiguously indicates the information being provided is the originating party's Proprietary Information.*" *Id.*, ¶ 5 (emphasis added). To be protected under the PIA, Proprietary Information disclosed orally must be so identified at the time of

---

[16]     (...continued)
              "Proprietary Information."

       PIA, ¶ 3.

disclosure and "thereafter [within thirty (30) calendar days] summarized in written form which *clearly and conspicuously identifies the Proprietary Information.  Id.* (emphasis added).  The PIA further provides that even when Proprietary Information is properly marked, the "rights and obligations provided by [the PIA] shall take precedence over specific legends or statements associated with Proprietary Information when received." *Id.*, ¶ 12.  For example, paragraph 6 of the PIA permits disclosure of Proprietary Information, even when properly marked, to the United States Government.  *Id.*, ¶ 6.

The PIA provides that it is the "entire agreement between the parties concerning the disclosure and protection of Proprietary Information and supersedes any prior or contemporaneous written or oral agreements as to the disclosure and protection of Proprietary Information in connection with the Program." *Id.*, ¶ 18. Additionally, the PIA provides clearly and unequivocally that it "may not be amended or modified except by subsequent agreement in writing by duly authorized representatives of the parties." *Id.*

Plaintiff has not presented evidence that ***any*** written disclosure of its allegedly Proprietary Information was "prominently identified as proprietary using an appropriate legend, marking stamp or other clear and conspicuous written identification which unambiguously indicates the information" was considered

proprietary by ATI. Plaintiff argues that it was ATI's intent that all information it disclosed would be protected under the PIA as long as Plaintiff made it clear by words, action or writing that the information was proprietary. While this may have been ATI's intent, the PIA requires written disclosures to be "prominently identified" as proprietary in a manner that was conspicuous and unambiguous. Because ATI failed to so identify any of its written disclosures, they are not protected under the PIA.

Plaintiff has failed to present evidence that it provided written summaries of oral disclosures within thirty days after the disclosure was made. Brower states in his affidavit in opposition to Defendants' Motion for Summary Judgment that for all oral disclosures, "Defendants also had a written summary that clearly and conspicuously identified ATI's proprietary information within thirty days of the non-written disclosure." Brower Aff., p. 5. He testified in his deposition, however, that he did not provide Thiokol with written summaries within thirty days after making non-written disclosures. *See* Brower Depo., Exh. 5 to Defendants' Motion for Summary Judgment, p. 138. As was noted previously, a party cannot avoid summary judgment by submitting an affidavit that clearly contradicts prior sworn deposition testimony. Moreover, Plaintiff has not produced any written summaries which were provided to Thiokol within thirty days after the oral disclosures and which are clearly and

conspicuously identified as Proprietary Information. ATI thus has failed to present evidence that it complied with the PIA's requirements for the protection of proprietary information that was disclosed in non-written form.

Plaintiff argues that the PIA was modified in some manner to excuse ATI's failure to identify clearly as proprietary its written disclosures and to provide written summaries of oral disclosures. The PIA provides clearly that it "may not be amended or modified except by subsequent agreement in writing by duly authorized representatives of the parties." PIA, ¶ 18. Plaintiff has neither alleged nor presented evidence of a written modification to the PIA and, as a result, any subsequent conduct or oral agreement would be ineffective to amend or modify the PIA's requirements.

Plaintiff has not presented evidence that it complied with the PIA's requirements for identifying disclosures as proprietary information. Consequently, whether or not ATI disclosed proprietary information to Defendants, it did not disclose the information in an appropriate manner to bring it within the protections of the PIA, and Defendants are entitled to summary judgment on ATI's claim that Defendants breached the PIA.[17]

---

[17]    Plaintiff's argument that its "technical breaches" of the PIA did not excuse Defendants' performance is misplaced. Defendants are entitled to summary judgment because ATI failed to comply with a key precondition for protection of its proprietary information under the PIA, not because ATI breached the PIA by failing to comply with its identification requirements.

## B.    Misappropriation of Trade Secrets

The elements of the tort of misappropriation of trade secrets under Texas law are: (1) a trade secret; (2) acquired through breach of a confidential relationship or discovered by improper means; and (3) used without authorization from the plaintiff.[18] *Phillips v. Frey*, 20 F.3d 623, 627 (5th Cir. 1994). "A trade secret is any formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it." *Id.* at 628; *Seatrax, Inc. v. Sonbeck International, Inc.*, 200 F.3d 358, 365 (5th Cir. 2000). "The trade secret must possess at least that modicum of originality which will separate it from everyday knowledge." *Phillips*, 20 F.3d at 628.

Plaintiff describes its alleged trade secret in terms which are fluid and ever shifting. Fundamentally, Plaintiff claims a trade secret in the concept of using fiber optics to obtain data from inside solid rocket motors.[19] Plaintiff also claims a trade

---

[18]    Plaintiff also alleges as a separate claim that Defendants misappropriated its "ideas." Plaintiff cites no legal authority for an independent claim for misappropriation of ideas, and the Court's research has not revealed such authority. *See Keane v. Fox Television Stations, Inc.*, 297 F. Supp. 2d 921, 938 (S.D. Tex. 2004) (noting that Texas has not recognized a cause of action for misappropriation of an idea), *aff'd*, 129 Fed. Appx. 874 (5th Cir. Mar. 17, 2005), *pet. for cert. filed* (Aug. 8, 2005). Consequently, Defendants are entitled to summary judgment on Plaintiff's misappropriation of ideas claim.

[19]    The uncontroverted evidence in the record establishes that by late November 1999, before meeting with Brower, Thiokol was considering the use of fiber optics as a way to obtain data
(continued...)

secret in the identification of several problems which need to be resolved in order to develop the fiber optics concept,[20] and in suggestions of potential ways to address the identified problems. The trade secret claimed by Plaintiff is, at best, a statement of the goal of using fiber optics in solid rocket motors and general concepts about how to accomplish that goal. Such undeveloped ideas or plans do not rise to the level of a trade secret. *See Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500 (S.D.N.Y. 2002), and cases cited therein; *see also Gonzales v. Zamora*, 791 S.W.2d 258, 264 (Tex. App. – Corpus Christi 1990, no pet.) ("We do not consider the statement that a trade secret may be only an idea to be a correct statement of the law.").

Additionally, Plaintiff has not presented evidence that it used the alleged trade secret in its business or that the alleged trade secret gave Plaintiff any advantage over its competitors. Plaintiff conceded that it did not have the ability to develop its concept or to test its various ideas for solving the well-known problems inherent in using fiber optics to obtain data from inside solid rocket motors. Indeed, it is

---

[19] (...continued)
from inside solid rocket motors. *See* Hyde Depo., Exh. 9 to Defendants' Motion for Summary Judgment, pp. 412-13; Johnson Depo., Exh. 10 to Defendants' Motion for Summary Judgment, p. 416.

[20] The identified problems are simply those inherent in using any method of obtaining real time data from inside an operational rocket motor.

undisputed that Plaintiff's alleged trade secret to date has not been fully developed by Plaintiff or by Thiokol.

Because Plaintiff's alleged trade secret, whether treated as a single united trade secret or as a list of discrete trade secrets, is essentially a generalized game plan to reach a generalized, undeveloped goal, and because there is no evidence that Plaintiff used the alleged trade secret in its business to obtain an advantage over its competitors, Defendants are entitled to summary judgment on Plaintiff's allegation that it possesses a trade secret.

Even if Plaintiff's undeveloped, generalized plan could rise to the level of a trade secret, information is not protected as a trade secret if it is voluntarily disclosed without reasonable precautions to protect its secrecy. *See Phillips*, 20 F.3d at 630-31. As is discussed in connection with Plaintiff's breach of the PIA claim, Plaintiff disclosed the alleged trade secret without designating it as information protected by the PIA. It is not "improper to obtain knowledge of a process where the holder of the alleged trade secret voluntarily discloses it or fails to take reasonable precautions to ensure its secrecy." *Id.* at 630. Although the holder of a trade secret will not lose the secret by disclosing it under circumstances imposing a duty on the other party not to disclose or use the secret, Plaintiff has not presented evidence that it properly utilized the PIA to impose such a duty on Defendants. This is an additional basis for entry of

summary judgment in Defendants' favor on the misappropriation of trade secrets claim.

Defendants are also entitled to summary judgment on Plaintiff's misappropriation of trade secrets claim because the uncontroverted evidence is that ATI, through the PIA, authorized Defendants to use ATI's proprietary information for the purpose of "developing fiber optic sensors for use in solid rocket motors in connection with RSRM and Thiokol IR&D." PIA, ¶ 4. Consequently, Plaintiff cannot raise a genuine issue of material fact that Thiokol used ATI's information without authorization.

Plaintiff has failed to raise a genuine issue of material fact on any of the three elements of its misappropriation of trade secrets claim and, therefore, Defendants are entitled to summary judgment on that claim.

## C.    Other Non-Lanham Act Claims

Plaintiff alleges that Defendants fraudulently induced it to disclose its trade secrets, negligently misrepresented that it would not disclose Plaintiff's trade secrets, and improperly converted Plaintiff's trade secrets. Plaintiff also alleges that Defendants used its trade secrets in unfair competition with Plaintiff and were unjustly enriched by its misuse of Plaintiff's trade secrets.

Plaintiff has conceded that these claims depend on the existence and misappropriation of Plaintiff's trade secrets. As a result, Plaintiff's failure to present evidence which supports its trade secrets claim is equally fatal to these related claims. Defendants are entitled to summary judgment on Plaintiff's claims of fraud in inducing disclosure of trade secrets, negligent misrepresentation, conversion, unfair competition, and unjust enrichment.

## D.    <u>Lanham Act Claim</u>

Plaintiff alleges that in November 2000[21] Defendants "presented a paper at a JANNAF Conference that summarized the results of a pressure vessel test that ATI did at Thiokol [without referring] to ATI or to the Thiokol/ATI business relationship." *See* Plaintiff's Clarification of Its Lanham Act Claim [Doc. # 96], p. 2. Plaintiff also alleges that in June 2002 Defendants "made a presentation at a Navy Conference, wherein test data collected through the use of ATI's trade secret technology was presented." *Id.* at 3. Plaintiff alleges that these actions by Defendants violated the Lanham Act, 15 U.S.C. § 1125(a)(1), which provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin,

---

[21]   In Plaintiff's Clarification of Its Lanham Act Claim, ATI states that the JANNAF Conference was in November 2002, but in Plaintiff's Response to the Motion for Summary Judgment and in the deposition testimony, it appears that the relevant JANNAF Conference was in November 2000.

false or misleading description of fact, or false or misleading representation of fact, which–

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (b) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

The essence of a Lanham Act false advertising or unfair competition claim based on "reverse palming off" is the allegation that a defendant is passing off the plaintiff's product as defendant's own. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003); *see also General Universal Sys., Inc. v. Lee*, 379 F.3d 131, 148 n.41 (5th Cir. 2004); *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990). The Fifth Circuit has identified the elements of a Lanham Act claim in the context of false advertising as (1) a false or misleading statement of fact about a product; (2) such statement either deceived, or had the capacity to deceive a substantial segment of potential customers; (3) the deception is material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate

commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 920 (2001).

With reference to the November 2000 JANNAF Conference presentation, Plaintiff alleges that the data presented was the result of a pressure vessel test performed by ATI. In support of this allegation, Plaintiff cites the deposition testimony of Lee Pearson, the Thiokol employee who presented the data at the November 2000 JANNAF Conference. Pearson testified, however, only that he presented data that Mort Johnson gave him, that the data was from a test performed at Thiokol, and that he was not particularly knowledgeable about the test because he was not involved in it. *See* Pearson Depo., Exh. 22 to Plaintiff's Response to Motion for Summary Judgment, pp. 163-64. The uncontroverted evidence in the record, however, is that Mort Johnson did not use the data obtained during the test in which ATI participated for any presentations. *See* Johnson Depo., Exh. 10(B) to Defendants' Motion for Summary Judgment, pp. 465-66. Instead, Johnson only used the data from later tests in which ATI did not participate. *Id.* at 466.

Plaintiff has not presented evidence that the data that Thiokol presented at the November 2000 JANNAF Conference was derived from the pressure vessel test in which ATI participated. Indeed, the uncontroverted evidence in the record is that

different data not related to ATI was used in the presentation. Accordingly, Plaintiff has failed to present evidence that raises a genuine issue of material fact on this aspect of its Lanham Act claim.

With reference to the June 2002 presentation at the Navy Conference, Plaintiff states only that Thiokol presented "test data collected through the use of ATI's trade secret technology." *See* Plaintiff's Clarification, p. 2; Plaintiff's Response to Motion for Summary Judgment, p. 58. This vague assertion is insufficient to meet Plaintiff's summary judgment burden or to support a verdict in Plaintiff's favor at trial. *See Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1429 (5th Cir. 1996). Moreover, for the reasons discussed previously, Plaintiff has failed to show that it had any trade secrets and, therefore, Thiokol could not have presented data derived from such non-existent trade secrets. Accordingly, Defendants are entitled to summary judgment on Plaintiff's Lanham Act claim.

## V.    CONCLUSION AND ORDER

Plaintiff has conceded that the Court had the authority, in its discretion, to require Brower to provide an expert report, which Brower has now submitted. The record is clear that Plaintiff did not designate Brower in a proper or timely manner as an expert on any issue other than damages. As a result, Plaintiff is not entitled to reconsideration of the Court's July 29 Order.

Dr. Beckwith lacks the proper qualifications to provide expert opinions in this case on the existence of trade secrets, the misappropriation of trade secrets, or damages. Moreover, he failed to utilize appropriate methodology. Because his opinions lack relevance and reliability, they are inadmissible in this case.

Plaintiff has failed to present evidence that raises a genuine issue of material fact regarding its breach of the PIA claim, its misappropriation of trade secrets claim, its Lanham Act claim, and each of its other claims which Plaintiff concedes depend on the existence of a protectable trade secret. As a result, Defendants are entitled to summary judgment on each of the remaining claims in this case. Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion for Clarification or Reconsideration [Doc. # 161] is **DENIED** and Plaintiff's Motion for Leave to File Reply Brief [Doc. # 164] is **GRANTED**. It is further

**ORDERED** that Defendants' Beckwith Motion [Doc. # 116] is **GRANTED**; and Defendants' Motion for Summary Judgment [Doc. # 112] is **GRANTED**. The Court will issue a separate final order.

SIGNED this **28th** of **September, 2005**.

Nancy F. Atlas
United States District Judge